UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NIKOLLE NIKOLLAJ,                      Civil Action No. 02-73373

              Plaintiff,               DENISE PAGE HOOD
                                       U.S. DISTRICT JUDGE
v.

COMMISSIONER OF,                       STEVEN D. PEPE
SOCIAL SECURITY,                       U.S. MAGISTRATE JUDGE

              Defendant.

_____

## REPORT AND RECOMMENDATION

Plaintiff Nikolle Nikollaj brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons that follow, **IT IS RECOMMENDED** that Defendant's motion be **DENIED** and Plaintiff's motion be **GRANTED IN PART** and this case be **REMANDED** for further proceedings consistent with this decision.

I.    **BACKGROUND**

      A.    **Procedural History**

Plaintiff applied for benefits on November 3, 1999, alleging disability since July 18, 1998, due to neck pain, headaches, bilateral upper arm pain and numbness (R. 29, 93, 115). Plaintiff's application was initially denied (R.66), Plaintiff, who was represented by counsel, and a vocational expert appeared at a hearing before Administrative Law Judge ("ALJ") Ethel Revels

1

on February 13, 2001 (R. 22-64).  In an October 25, 2001, decision, ALJ Revels concluded that

Plaintiff had a combination of impairments consisting of a cervical disorder, capsulitis, and

tendenitis of the left shoulder, a back disorder and obesity which significantly limited his

abilities to perform work-related activation (R. 676-684).  She determined that these impairments

did not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 ("the Listings") (R. 682).  Judge Revels concluded that Plaintiff remained capable of

performing a significant number of  light jobs in the national economy that accommodated his

limitations (R. 683).  On June 27, 2002, the Appeals Council denied Plaintiff's request for

review of the ALJ's decision (R. 5-6) making the ALJ's decision the final decision of the

Commissioner.

Plaintiff requested judicial review of the Commissioner's final decision pursuant to 42

U.S.C. § 405(g).  On October 31, 2003, this Court remanded Plaintiff's claim for additional

administrative proceedings (R. 689-91).  While Plaintiff's case was before the Court, he filed an

additional application for disability insurance benefits on September 30, 2002, alleging a

worsening of his condition (R. 346).  The second application was also denied at the initial level

on March 4, 2003 (R. 320, 327).  This application was consolidated with Plaintiff's October

1999 application on remand (R. 308-09).

An administrative hearing on both applications was held on November 8, 2005, again

before ALJ Revels, at which Plaintiff testified and was represented by counsel (R. 743).  LuAnn

Castellana, a vocational expert, also appeared and testified at the hearing.  On May 25, 2006, the

ALJ decided Plaintiff was disabled from August 7, 2002, through November 4, 2005, but not

prior to or thereafter because at those times he was capable of performing a significant number

2

of limited light-level jobs despite his impairments (R. 308-18).  This became the Commissioner's

final decision when the Appeals Council denied Plaintiff's request for review (R. 299-301).

### B.    **Background Facts**

Plaintiff was 48 years old at the time of ALJ Revels' second decision (R. 312, 773).  He

immigrated from Kosova when he was 15 years old, after completing 9 years of schooling (R.

26).  Plaintiff has the limited ability to read and speak English but not write English, and had

someone else fill out the Social Security forms for him (R. 27, 312, 752, 775-76).  He worked

nearly 20 years as a maintenance machine repairer for the same employer (R. 28, 107-108, 116,

146, 753).  Plaintiff injured himself while working in 1997, after which he completed physical

therapy and returned to work (R.  753-54).  He said he stopped working in July 1998 due to

constant pain in his neck, left shoulder and arm, headaches, and intermittent low back pain

radiating down his left leg (R. 752-60).  Plaintiff also alleged a heart impairment beginning in

August 2002, which caused occasional chest pain and dizziness (R. 761).

### 1.    *Plaintiff's Hearing Testimony And Statements*

Plaintiff last worked in maintenance at Thornapple Valley (R. 28).  Before he left his job

in July 1998 due to severe pain (R. 28, 29), he was working on favored status (R. 28).  This

meant that he did not have to walk around, and primarily stayed in the shop doing light work.

When he had trouble completing a task, he called other maintenance people to help him finish

the job.  He was also able to take many breaks — sometimes more than five breaks which could

last for hours.

In forms completed for and statements made to Social Security, Plaintiff subjectively

describes severe neck, left shoulder and arm pain as well as headaches and numbness in the left

extremity (R. 115, 365, 385-387).  At times his pain is so severe he had to stay in bed all day and sometimes he is unable to sleep at night (R. 129, 391).  The pain is daily and has gotten worse with time (R. 72, 129, 132, 387).  It is stabbing and throbbing and increased by arm or head movement and driving (R. 130, 132-133, 387, 389).

After the onset of the low back and heart problems, he reported continuation of these symptoms as well as new symptoms of weakness and chest pain, and increased limitations in his ability to stand or walk – no more than 10-15 minutes due to low back pain, tiredness and dizziness (R. 385, 387).  He cannot lift more than a gallon of milk (R. 389).  He reports taking more medications (R. 147, 291, 398, 405), and has side effects of drowsiness and dizziness (R. 388).  His neck and left side problems are aggravated by movement of the head or use of the arms, and he needs to use ice, massage and lie on a rolled up towel to relieve pain (R. 388-396).

He testified the low back pain started approximately September 2000 (R. 34-35).  It is intermittent and occurs with bending, twisting, sitting and getting up.  It goes into his left leg down to the foot (R. 757).  His heart problems started in August 2002, and since then he still gets chest pain, though less often now —  every two to three months lasting a few minutes. He also experiences dizziness whenever he gets up from a chair, bed or out of a car a bit fast (R. 761-763).  He always feels weak (R. 779).

Headaches are daily, especially with head and neck motion, and can last from an hour to all day (R. 31-36, 757-758).  The neck and left arm/shoulder pain to the hand is constant and ranged from mild to severe, such that he had good days and bad days.  He may have one day of mild pain, then 2 to 4 days of severe pain (R. 755-756, 759-760).  Head movement – down, up, right or left – aggravates the pain (R. 31-33, 760).  Sleeping in the wrong position causes him to

4

wake with a severe headache and neck pain (R. 760). He has difficulty sleeping at night, waking 5-10 times because of pain, and he is usually not rested in the morning, which causes problems functioning during the day (R. 769). He has trouble using his left hand for squeezing, grasping, pushing, pulling and reaching and these things cause pain to the shoulder (R. 31-33, 767-768). He can hold small objects in his left hand but not a gallon of milk without using the right hand and holding it close to him (R. 38, 767).

Plaintiff testified he has problems with concentration and attention for long periods, and in the last year prior to the hearing, increased memory problems too (R. 31, 36, 770). He discontinued a medication that helped him sleep at night because it left him "like a vegetable" during the day (R. 763-764). His other medications cause dizziness and drowsiness (R. 764). They can lessen his pain, but he also has to rest from 30 to 60 minutes up to 3 times a day, or more depending on the severity of pain, lying down with a rolled towel under his neck (R. 38-40, 758-759, 765-766). He uses a cane to get up from a chair or couch (R. 766). He applies ice 2-3 times a day up to 15 minutes at a time (R. 38-39). He can sit for 30-45 minutes at a time (R. 36-37, 766). He can stand 5 to 15 minutes, sometimes walk around the block, other times only 2 to 3 houses down the block (R. 767). A typical day is spent watching TV news or outdoors shows, some days he will read a paper, some days takes short walks. The rest of the time is spent "pretty much . . . just resting" (R. 764).

### 2.    *Medical Evidence*

Since the alleged onset of July 18, 1998, Plaintiff has suffered from a C6-7 central disc herniation and cervical radiculopathy, shoulder impingement syndrome and left-sided carpal tunnel syndrome (R. 180-183, 204, 253). On November 27, 2000, he was also diagnosed with

left lumbar radiculopathy (R. 257). On August 6, 2002, he had congestive heart failure,

requiring ongoing treatment for hypertensive cardiovascular disease (R. 476-558, 601-610,

647-664).

### Medical Evidence Prior To August 2002

Ten months before leaving work, Plaintiff injured his right shoulder on September 6,

1997. He was referred to orthopedic surgeon, Joseph Salama, M.D., who evaluated Plaintiff on

October 10 and October 30, 1997 (R. 181, 210-12). Dr. Salama diagnosed a mild right shoulder

impingement syndrome (R. 211). An MRI of the right shoulder did not show a rotator cuff tear

but rather a central disc herniation at C5-6 on the left (R. 181, referring to R. 179-80). This was

of moderate sized herniation abutting the spinal cord but with no significant spinal stenosis or

neural foraminal narrowing (R. 180). Plaintiff had full range of neck motion, flexion, extension

and rotation, and bilateral shoulder abduction and flexion to 155 degrees (R. 181). His grip,

elbow flexion and extension, and reflexes were normal.

Dr. Salama referred Plaintiff to Parmod Mukhi, M.D., including physical therapy,

medications, and trigger point injections (R. 213-46). On November 10, 1997, Plaintiff rated his

level of pain at worst an 8 and currently a 6 on a scale of 0-10 (R. 214). Dr. Mukhi found

minimal tenderness over Plaintiff's cervical spine and right scapula, none in his thoracic or

lumbosacral spine (R. 215). Plaintiff had full range of motion in his neck, shoulder, back, and

lower extremity; negative straight leg raising; muscle strength of 5/5 in all extremities, normal

sensory responses and reflexes (R. 215-16). Plaintiff was taking Prilosec. Dr. Mukhi prescribed

Elavil, 10mg, for pain (R. 218). Plaintiff was able to tolerate working without restrictions. Dr.

Mukhi gave him some exercises to do at home.

6

At a follow up exam on November 24, the findings were similar and the Elavil helped somewhat (R. 220).  Dr. Mukhi recommended formal physical therapy.  On February 9, 1998, Plaintiff reported that his shoulder pain was significantly improved (R. 226).  Physical therapy ended in February 1998 and home exercises was continued.   He also used ice packs for pain. On February 26, he reported less pain in his left upper extremity and neck (R. 228).  February 1998, EMG testing was negative for cervical radiculopathy (R. 229).  Elavil was continued as it helped somewhat.

By April 30, 1998, Plaintiff stopped taking Elavil for pain because it was no longer helping (R. 230).  A Lidocaine injection in the cervical area provided some relief (R. 231).  He was to use ice and limit activities for a few days.  The injection relief wore off after 3-4 days, although he returned to normal activities after 24 hours -- sooner than recommended -- though he did not think this aggravated his pain (R. 232).  He continued to have good strength and no radiation.  Elavil was restarted and also Lodine for short term use (R. 233).  On May 14 x-rays of the shoulder were again negative (R. 236).  When seen June 1, Plaintiff reported that the Lodine helped, but not the Elavil which he believed  made him sleepy in the morning (R. 237).  He reported some tingling in his hands and radiation of pain to the shoulder.  Dr. Mukhi reported that EMG testing revealed mild left carpal tunnel syndrome but no evidence of cervical radiculopathy (R. 237-38).  On physical examination, Plaintiff had tenderness along the left scapular borders but good strength in his upper extremities with no sensory findings and full range of motion bilaterally.  Dr. Mukhi prescribed exercises to help protect the carpal tunnel and wrist, as well as prescribing wrist splints and ice (R. 238).

On June 22, intermittent neck pain continued with it being worse after a heavy work day

than a light work day (R. 240).  He used his wrist splints irregularly but they did help.  He had no numbness or tingling.  Dr. Mukhi prescribed Desyrel for the radicular symptoms.  On physical exam, again there were no sensory deficits.

On July 13, 1998, Dr. Mukhi reported that Plaintiff had not improved with his shoulder and neck pain, again worse afer a heavy workday (R. 243).  On physical examination, he had full range of motion in all directions, full strength and no other significant abnormalities.  Dr. Mukhi arranged for repeat EMG testing (R. 244), which continued to show no cervical radiculopathy and reported that Plaintiff's carpal tunnel syndrome was unchanged and stable since June 1, 1998 (R. 247).

On July 20, 1998, two days after Plaintiff's onset date, neurologist S.E. Newman, M.D., of the Detroit Institute of Physical Medicine and Rehabilitation evaluated Plaintiff (R. 198).  An x-ray of the cervical spine showed narrowing at C6-7 with a large spur and minimal foramina encroachment, straightening of the cervical lordosis, and changes of the left acromioclavicular joint (R. 200).  Clinical examination of the cervical spine demonstrated left rotation of 70º, flexion of 80º, and extension of 60º out of a normal 90º.  Plaintiff had  percussion tenderness over the C6-7.  He had positive Tinel's sign over the carpel tunnel on the left, left grip strength weakness and clicking over the left acromioclavicular joint with motion.  Other than some restricted abduction and flexion of the left shoulder girdle, Plaintiff had a normal range in his shoulder, dorsolumbar spine, hip, knee, ankle and feet; normal straight leg-raising; and no other abnormalities (R. 200).  Dr. Newman diagnosed post-traumatic precipitation and/or aggravation of the disc space narrowing at C6-7 with limited foraminal enchroachment; traumatic lesser occipital neuralgia on the left; persistent symptomatic capsulitis and tendenitis of the left

shoulder girdle; nerve irritation at the left carpal tunnel (R. 201).  Plaintiff was to return for additional functional evaluation of his upper extremities.  In the meantime, based on his evaluation, Dr. Newman recommended that Plaintiff limit his activities to the level of the shoulder girdle in terms of reaching, stretching, pushing, pulling; limit his hand grasping, pinching and squeezing; and limit his neck and head rotation, flexion or extension.

On October 23, 1998, Dr. Newman interpreted an October 9, 1998 MRI as showing a decreased central disc protrusion at C6-7 making surgery unnecessary at that time (R. 192).  Dr. Newman continued to treat Plaintiff for his pain and other symptoms through at least June 4, 1999, and again in November 2000 (R. 253), the summer and early fall of 2001 (R.292, 297).  He continued to have clinical signs of decreased cervical and bilateral shoulder motion limitation, point tenderness over the left occipital nerve at the nuchal ridge radiating to the left temporal region (R. 189), and reproduction of symptoms into the left arm along the C6-7 distribution with left shoulder motion (R. 188).  Plaintiff was treated with physical therapy and injections together with pain, anti-inflammatory and muscle relaxant medications (R. 184-91).

By June 4, 1999, Plaintiff experienced pain radiating from the base of the cervical spine through the left shoulder and into the upper forearm.  Dr. Newman reported that unlike Dr. Mukhi's test the year before now there were increased electromyographic findings consistent with nerve root irritation over the C7 nerve root but that nerve conduction studies in the neck upper extremities (C4-T1) did not demonstrate similar abnormality (R. 184-85).

On December 15, 1999, Elizabeth Edmund, M.D. a consulting physiatrist, evaluated Plaintiff for the state agency (R. 202-05).  Plaintiff complained of numbness in his fingers, generalized weakness in his left hand, pain and limited motion in his cervical spine, but full

range of lumbar motion and full range of motion in both shoulders.  Dr. Edmund's findings included a slight decrease of muscle mass in the right trapezius, postural tilting of the head, left-sided neck pain radiating into the left arm with cervical rotation, and restricted cervical motion. Plaintiff had normal muscle testing, intact sensory findings, no intrinsic hand atrophy, but positive Tinel's sign on the left (R. 204).  She reported that Plaintiff was able to open a jar, button clothing, write legibly, pick up a coin and tie shoe laces (R. 205).

Dr. Edmund diagnosed suspected cervical disc pathology; probable hypertension; history of left carpal tunnel syndrome (R. 204).  X-rays taken at that time were negative in the right shoulder, and showed only mild degenerative changes at C5-7 (R. 206).

There was a gap of about one and one-half years in Plaintiff's treatment with Dr. Newman (R. 253).  Plaintiff testified that he wanted to see Dr. Newman more often, but was under financial constraints (R. 39).  He received pain medication refills from his personal physician, Dr. Pearce, who treated Plaintiff's high blood pressure.  In the interim, on March 22, 2000, Plaintiff settled his workers compensation claim (R. 112-13).

After the June 4, 1999, visit, Dr. Newman next examined Plaintiff  November 27, 2000, (R. 253-56).  Plaintiff reported ongoing problems related to painful motion and limited mobility of his cervical spine extending to his scalp, aching and hypersensitivity along the left side of his face, his lumbar spine, and his shoulder which radiated down his left arm and hand, with numbness involving his little finger (R. 256).  Plaintiff had positive straight leg raising, with radiation into his left thigh and calf.  Otherwise, Plaintiff had full ranges of motion in his cervical spine, shoulders, elbows, wrists, and fingers (R. 255); and in his dorsolumbar spine, hips, knees, ankles, and feet (R. 255).  Clinical findings included limited mobility and tenderness

10

at the cervical spine, symptoms along the C7 nerve root distribution with motion of the shoulders, limited left shoulder mobility, weakness with pain inhibition on manual muscle testing of the left arm, forearm and hand (R. 254-56).  Dr. Newman found no significant motor, sensory or reflex abnormalities (R. 255-56).  According to Dr. Newman, EMG examination showed some occasional positive waves along the left C7 nerve root, but were otherwise unchanged since his previous study of June 4, 1999, described as low grade left radiculopathy (R. 256, referring to R. 269).  The EMG of the left arm showed low grade left radiculopathy (R. 269, referring to R. 270).  Dr. Newman also reported some increased insertional activity in Plaintiff's lumbar spine along the S1 nerve root, but it otherwise demonstrated no significant abnormalities (R. 256).

Dr. Newman identified functional limitations including: inability to sit for more than 20-30 minutes at a time or more than 2-4 hours out of eight; inability to stand more than 10-15 minutes at a time or to walk more than 2 hours out of 8; a need to change positions, including "recumbency, if necessary" for up to 5 minute; frequent breaks of 30-60 minutes; no repetitive or frequent grasping, gripping, pinching or squeezing with the left non-dominant hand; no exposure to extreme temperatures and humidity changes (R. 257).

Plaintiff saw Dr. Newman on August 13 and September 25, 2001, and ordered MRI tests (R. 292-98).  The August 13 examination revealed continued limitations of cervical, lumbar, and left shoulder motion, with radiating pain in the left C6-7 nerve root distribution.  There was also diffuse hyperreflexia at the biceps, triceps and brachioradialis areas bilaterally, positive left straight-leg-raise and hyperrefexia in the left lower extremity.  Dr. Newman noted that Plaintiff had trouble both changing positions on the examining table as well as getting on and off the table

11

(R. 292-94).  There was also a September 25, 2001, finding of decreased left triceps reflex (R. 297).  The August 30, 2001, MRI now shows degeneration, disc dehydration and "some bulge" at L4-5 and L5-S1, without herniation or stenosis (R. 295).  A cervical MRI performed on the same date confirms a small left lateral disc herniation at C6-7, which a mild encroachment upon the neutral foramina at that lever (R. 296).

Based on the EMG's confirming C7 radiculopathy, the recent examinations, and the MRI results, Dr. Newman offered to refer Plaintiff to a surgeon for consultation.  Dr. Newman noted that Plaintiff uses a cane, is functionally restricted in his activities, and unable to perform activities requiring concentration (R. 292, 294, 298).

### Medical Evidence From August 2002 Through November 2005

Plaintiff was admitted to St. John Hospital from August 6-11, 2002, for left-sided chest pain (R. 476-480).  Echocardiography revealed severe left ventricular dysfunction with an estimated ejection fraction of 25 percent (R. 477).  Stress test results indicated he achieved 7.0 METS while exercising for 5.45 minutes on a Bruce protocol.  He was diagnosed with dilated cardiomyopathy, hypertension and gastroesophageal reflux (R. 479).  In follow-up treatment with Vithal Kinhal, M.D., FACC, a cardiovascular specialist, Plaintiff continued to present with diagnoses of hypertensive cardiovascular disease, cardiomyopathy, severe left ventricular dysfunction and dyslipidemia (R. 550).  Plaintiff continued to see Maurice Belkin, D.O., at Doctor's Clinic for his hypertension, headaches, back and neck pain, chest pain, heartburn, loss of sleep and other ailments (R. 515-542, 573-600, 644-647).

Cynthia Shelby-Lane, M.D., a consultative examiner for the State agency, saw Plaintiff in

December 2002 (R. 559).  He complained of neck pain and headaches, left shoulder pain,

occasional parethesia in the arms, low back and leg pain.  He stated he was unable to lift more

than a gallon of milk, to sit over 30 minutes, or walk over 5-10 minutes without aggravation of

his pain.  He also complained of tremors and weakness in his legs.  On exam, he was 5' 10" and

235 lbs and his blood pressure was uncontrolled despite taking medications for it (R. 560-561).

There was decreased strength and paresthesia of the left upper extremity, and he was unable to

walk on toes or heels (R. 561).  Range of motion was reduced in the cervical spine, lumbar spine,

left shoulder and left hip flexion (R. 562-563).  Dr. Shelby-Lane's impression was that the

Plaintiff had a pinched nerve in the neck, chronic back and leg pain, hypertension and chronic

headaches (R. 561).

A February 14, 2003, echocardiogram revealed mild left ventricular hypertrophy and an

ejection fraction of 35 percent (R. 602).  An esophagogastroduodenoscopy in July 2003 showed

probable Barrett's esophagus, a small sliding hiatal hernia, and nonerosive gastritis of the antrum

(R. 616).  An August 28, 2003, nuclear cardiac scan showed left ventricular ejection fraction had

increased to 38 percent (R. 604).  On October 14, 2003, Dr. Belkin advised Plaintiff against

traveling based on his medical conditions and chest pain (R. 584).

At the referral of Plaintiff's primary care physician, Dr. Belkin, Plaintiff was seen by

John Zinkel, M.D., Ph.D., FACS, in August 2004 for surgical consultation regarding his neck (R.

631).  Exam was non-focal, but based on record review and symptoms, Dr. Zinkel's impression

was that the Plaintiff had C7 radiculopathy and left carpal tunnel syndrome (R. 634).  Plaintiff

had full range of motion of the cervical, thoracic and lumbar segments of the spine (R. 633).

Pinprick sensation was normal in all dermatomes tested bilaterally, including, *inter alia*, the

13

midneck and lateral shoulder.  Dr. Zinkel recommended another MRI without expectation of

finding a structural cause for Plaintiff's symptoms, but the MRI done September 14, 2004, did

show a possible herniation at C6-7 "which is consistent with the patient's symptoms" of left C7

radiculopathy, making him a candidate for surgery per Dr. Zinkel (R. 635).

A February 1, 2005, echocardiogram indicated the left ventricular ejection fraction had

improved to 50 percent (R. 639).  Plaintiff was seen in the emergency room at St. Joseph Mercy

Hospital in June 2005 for "near syncope" (R. 648).  He was advised, on discharge, to return to

his normal activity and to sit or stand up slowly (R. 648-650).  There are ongoing complaints of

"weakness" to Dr. Belkin (R. 666-671).  Progress notes of Dr. Kinhal, the cardiologist, show

continued treatment for complaints of chest pain and dizziness through August 2005, with a note

on April 15, 2005, that Plaintiff is also on Lexapro for depression (R. 651-653).  This had been

previously diagnosed and treated by Dr. Belkin(R. 667)

On November 3, 2005, Dr. Kinhal notes Plaintiff's left ventricular ejection fraction to be

58 percent, and that he had reported no additional syncopal or dizzy spells (R. 671).

### 3.   *Vocational Expert Testimony*

Vocational Expert ("VE") Luann Castellana testified that Plaintiff's past relevant work as

a maintenance machine repairer was heavy in exertional requirements and skilled (R. 42, 145,

404, 781-782).  Some of his mechanical skills transfer to similar work in industrial settings (R.

404, 782).

A hypothetical question posed by the ALJ at the hearing assumed a functional capacity

for "light work" and:

> Our hypothetical claimant also needs work that will allow for limited writing in the
> English language; no use of vibrating tools; no repetitive forward flexion, flexing

and no repetitive left-sided neck flexion, flexing . . .

* * *

. . . No repetitive bending. No work at hazardous heights or around dangerous machinery. Our hypothetical claimant does suffer with some pain, which I rate as I would believe would create moderate limitations in the ability to maintain attention and concentration for extended periods, thereby limiting him to the simpler, routine, repetitive type tasks. Our hypothetical claimant also has other limitations that would restrict him to sitting no more than 45 minutes at a time, standing no more than 45 minutes at a time, and walking no further than a half a block. (R. 783-784).

The VE testified that at the "light" exertional level, an individual with those hypothetical limitations could not perform the Plaintiff's past work, but could perform jobs in machine feeding/tending (1,500), assembly (2,000), inspection and checking (1,000), and packaging (1,500) (R. 784-786). The added limitation of no repetitive forward flexion of the neck eliminates all these jobs (R. 787).

At the "sedentary" exertional level, an individual with those limitations could perform 1,000 inspector/check jobs, 1,000 packaging jobs, and 1,500 security system monitor and security entrance control jobs (R. 795-796). The added limitation of no repetitive forward flexion of the neck eliminates all these jobs as well (R. 796-797).

A limitation for no repetitive use of the non-dominant left upper extremity eliminates all the machine feeding/tending jobs at both the light and sedentary exertional levels, and reduces the assembly job to 1,000 at the light level (R. 788-789). The inspection and checking jobs would remain at 1,000, but the packing jobs would be reduced to 1,000 at the light level. In the sedentary category, the VE indicated there were 500 inspection and checking jobs, and 500 packing jobs (R. 797). The added limitation had no impact on the 1,500 sedentary security monitor jobs.

The experience of dizziness when getting up in these sit/stand option jobs can impact the

15

ability to sustain pace in the production jobs (R. 789).  If the exertional limitations for sitting,

standing and lifting to which Plaintiff testified were assumed, all light jobs would be precluded,

leaving a reduced range of sedentary positions (R. 810-811).

   The VE testified that some of the limitations described by Plaintiff's treater Dr. Newman

are preclusive of all work.  The need to take frequent breaks of 30-60 minutes at a time in an 8

hour period is preclusive (R. 812).  The inability to stand/walk more than 2 hours out of 8 and to

sit more than 2-4 hours of 8 is also preclusive (R. 812-13).

   The VE testified also that if Plaintiff's testimony were found fully credible, there would

be no jobs he could do because of the fatigue, lack of sustained concentration, and the need to lie

down up to 3 times a day (R. 809-810).

### 4.   *ALJ Findings and Decisions*

   On October 25, 2001, ALJ  Revels found that, despite his impairments, Plaintiff did not

have an impairment or combination of impairments listed in or medically equal to one listed in

Appendix 1 of 20, Subpart P, Regulations No. 4 (R. 682).  She found that Plaintiff retained the

residual functional capacity ("RFC") to perform a significant range of work with these

restrictions: no lifting or carrying more than twenty pounds maximum or ten pounds frequently,

with limited bending; no work in temperature extremes; no work around moving or dangerous

machinery; no work with vibratory tools; no repetitive use of the left non dominant upper

extremity, and allows for limited reading and writing, and limited understanding of English (R.

680-681).  Relying on VE testimony, and using the Medical Vocational Guidelines as a

framework for decision-making, the ALJ concluded that Plaintiff was not disabled because he

could perform a significant number of jobs existing in the national economy (R. 682).  20 C.F.R.

16

Pt 404 Sub. Pt. P, Ap. 2 § 201.24, 201.18.

On May 25, 2006, ALJ Revels found Plaintiff has severe impairments of a back disorder; neck disorder; shoulder disorder; hypertensive cardiovascular disease and cardiomyopathy with an episode of congestive heart failure; esophagus disorder; mild left carpal tunnel syndrome; and obesity (R. 313). Despite his impairments, ALJ Revels opined Plaintiff did not meet the criteria of any impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 at any time relevant to her decision (R. 315). Yet, she found from August 8, 2002, through November 3, 2005, Plaintiff lacked the physical residual functional capacity to perform work in competitive employment on a sustained basis due to his cardiomyopathy. ALJ Revels, therefore, reached a finding of disabled under SSR 96-9p. She concluded that Plaintiff was under a disability, as defined by the Social Security Act, from August 8, 2002, through November 3, 2005, but not thereafter.

In reaching this conclusion, the ALJ noted that Plaintiff's statements concerning the limiting effects of his symptoms are generally credible for the closed period of disability. She indicated that Plaintiff's cardiomyopathy closely aligned section 4.08, as evaluated under section 4.02B, of the Listing of Impairments. Further, Plaintiff reported tremors and weakness in his legs and had a syncopal episode requiring an ER visit in June 2005.

ALJ Revels opined that medical improvement occurred as of November 4, 2005, the date the Plaintiff's disability ended. She noted Plaintiff's left ventricular ejection fraction had improved from a low of 25-30 percent in August 2002, when he became disabled, to 58 percent by November 2005. Further, Plaintiff has no syncopal episodes since June 2005 and reported no additional dizzy spells in his November 2005 follow-up visit with Dr. Kinhal. ALJ Revels indicated the "medical improvement that has occurred is related to the ability to work because

the claimant no longer has a less than sedentary residual functional capacity brought on by the severity of the cardiomyopathy."

ALJ Revels found from July 18, 1998, through August 7, 2002; and from November 4, 2005, through the date of her decision, Plaintiff had the residual functional capacity to perform light work that allows for limited writing in the English language; no use of vibrating tools; no repetitive forward flexion of the trunk; no repetitive left side neck flexion; no work at hazardous heights or around dangerous machinery; simple, routine, repetitive-type tasks due to moderate limitations in the ability to maintain attention and concentration for extended periods because of pain; no repetitive use of the left arm; and Plaintiff can sit for no more than 45 minutes at a time, stand for no more than 45 minutes at a time, and walk no more than a half block without stopping (R. 315-316).  She also found that Plaintiff had not been able to perform past relevant work at any time relevant to her decision (R. 317).

To determine the extent of erosion of the unskilled light occupational base caused by these limitations, ALJ Revels asked VE Castellana whether jobs exist in the national economy for an individual with the Plaintiff's age, education, work experience, and residual functional capacity from July 18, 1998, to August 7, 2000 and as of November 4, 2005 (R. 317-318).  VE Castellana testified that given all of these factors the individual would be able to perform the requirements of representative occupations in the southeast Michigan regional economy, "such as assembler, 1,000 jobs at light exertion; inspector/checker, 1,000 jobs at light and 1,000 jobs at sedentary exertion; packager, 1,000 jobs at light and 1,000 jobs at sedentary exertion[1]; and

---

[1] Although ALJ Revels indicates in her opinion that the VE testified that 1,000 packager jobs existed at the sedentary level using the ALJ's RFC (R. 318), VE Castellana actually stated that no repetitive use of the left arm at the sedentary level would reduce the number of packing

surveillance system monitor, 1,500 jobs at sedentary exertion."  VE Castellana indicated that the identified jobs exist in significantly higher numbers in the national economy.

In reaching the RFC, ALJ Revels found Plaintiff's statements concerning the intensity, duration and limiting effects of his symptoms were not fully credible from the alleged onset date through August 7, 2002, and from November 4, 2005, through the date of her decision (R. 316). She noted Plaintiff's treatment from the alleged onset date of disability until August 2002, and since the substantial improvement in his cardiac condition from November 2005, is consistent with the ability to perform a limited range of light exertion work.  Neither the treating nor examining

physicians opined that Plaintiff required multiple extended rest breaks to lie down for relief from headache pain.  Further, Plaintiff went without significant treatment from July 1999 to November 2000, and then from November 2000 to June 2001, when he had an upper GI endoscopy.  Plaintiff again went without treatment for nearly a full year, from August 2001 until the onset of his cardiac condition in August 2002.

In addition, Plaintiff exhibited full range of motion in all segments of the spine and had normal pinprick sensation in all areas tested during his neurosurgical consultation with Dr. Zinkel in August 2004.  Thus, ALJ Revels opined the effects of Plaintiff's musculoskeletal impairments did not substantially contribute to his less than sedentary residual functional capacity then, and support the finding of a residual functional capacity for a limited range of light exertion.  Plaintiff had been treated only conservatively for all of his impairments.  His medications list indicates that his only pain medication was acetaminophen, along with a muscle

_____

jobs to 500 (R. 797).

relaxant (Soma) and an anti-inflammatory (Diclofenac SR).  Furthermore, Plaintiff alleged no limitation of the right upper extremity whatsoever.

After considering the testimony of the vocational expert together with all the other evidence in the case record, ALJ Revels concluded that from July 18, 1998, to August 7, 2002 and beginning on November 4, 2005, Plaintiff has been capable of making a successful adjustment to work that exists in significant numbers in the national economy.  Accordingly, she found that a finding of "not disabled" is therefore appropriate under the framework discussed above.

## II.   ANALYSIS

### A.   <u>Standard of Review</u>

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Secy' of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her

past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects. A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform. *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

### B.   Factual Analysis

Plaintiff argues that the Commissioner, *via* ALJ Revels, incorrectly applied the regulations on "medical improvement" to find there was no disability after November 3, 2005. 20 C.F.R. § 404.1594. In addition, Plaintiff contends ALJ Revels also failed to evaluate or give appropriate weight to the opinion of Plaintiff's treating physician, contrary to 20 C.F.R. § 404.1527. Therefore, Plaintiff avers that the RFC for a limited range of light work both before and after the awarded closed period is not supported by "any evidence." (Dkt. #40, p. 13). Moreover, Plaintiff contends that the ALJ's credibility assessment is "incomplete, unsupported, and failed to comply with 20 C.F.R. § 404.1529(c)."

### 1.   Plaintiff's Treating Physician's Opinion And Plaintiff's RFC

Plaintiff argues that the ALJ committed error in failing to give deference to Dr. Newman's opinions, and that her finding of "not disabled" relies on vocational testimony which is responsive to an inaccurate and incomplete hypothetical question.  Plaintiff argues that the ALJ relies on limited portions of the medical record that do not support Plaintiff's contentions, and specifically fails to include in her RFC a limitation on forward neck flexion which the VE testified would support a finding of disabled.  In addition, Plaintiff contends the ALJ disregards Dr. Newman both as to his findings and his conclusion on severe limitations on Plaintiff's residual functional capacity, including limits on sitting for more than 4 hours in any workday, and the need for frequent 30-60 minute breaks and to lie down during the day (R. 257).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight.  The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).  The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally

22

give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20

C.F.R. §404.1527.  The Commissioner will only be bound by a treating source opinion when it is

"well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d); *See*

*also*, S.S.R. 96-2p.  The conclusion of whether a claimant is "disabled" is a decision reserved to

the Commissioner to decide.  20 C.F.R. §§ 404.1527(e)(1), (2), 416.927(e)(1), (2).  And, "[w]e

will not give any special significance to the source of an opinion on an issue reserved to the

Commissioner." *Id.* at §§ 404.1527(e)(3), 416.927(e)(3)

Here, Plaintiff's cervical condition was repeatedly described as mild, with no reflex,

sensory deficits or diminishment of motor strength.  Rather than evidence of significant

worsening, Dr. Newman, in October 1998 noted that the MRI showed a decrease in disc

protrusion which made surgery unnecessary, there was nonetheless some minimal foraminal

encroachment in 1998 (R. 200).  When he saw him again in the summer and fall of 2000, the

findings were not significantly worse than before.  June 1998 EMG testing revealed mild left

carpal tunnel syndrome (R. 237-38), which showed no change in July 16, 1998, studies (R. 247).

When examined by Dr. Newman in November 2000, there is no evidence of worsening of this

condition.

While Dr. Newman did note some reduction in disc protrusion in October 1998, by June

4, 1999, Plaintiff experienced pain radiating from the cervical spine into the upper forearm, and

unlike Dr. Mukhi's test the year before now there were increased electromyographic findings

consistent with nerve root irritation over the C7 nerve root.  Dr. Newman found no significant

motor, sensory or reflex abnormalities (R. 255-56).  Yet, an EMG while showing some

occasional positive waves along the left C7 nerve root, was otherwise unchanged since the June 4, 1999, study and showed only low grade left radiculopathy (R. 256, referring to R. 269).

While there is some evidence of a deterioration in Plaintiff's cervical problems leading to his need to stop his heavy work, the evidence is more equivocal as to the degree of exertional and other impairment this caused.  The ALJ did not accept Plaintiff's assertion that he could only lift 10 pounds, nor Dr. Newman's repeating of this estimate, yet, the ALJ also rejected the consulting physician for the state agency who thought Plaintiff could perform medium work. Rather the ALJ found Plaintiff capable of a limited range of light work with only occasional lifting over ten pounds.  There is substantial evidence in the record to uphold this finding.  The ALJ also could discount Dr. Newman's more extreme claims on Plaintiff's limitation of 4 hours sitting and on his need to lie down and take frequent 30-60 minute brakes.  While these opinions have some support in the medical record, that support is not so convincing that as a matter of law no reasonable fact finder could not reject them, particularly given the likely reliance in significant part on Plaintiff's subjective accounts and assertions to arrive at these estimates and conclusions.

Accordingly, the ALJ was not required to include Plaintiff's claimed limitation in head/neck forward flexion in the hypothetical because those claims were not substantiated by the record.  *Stanley v. Secretary of Health and Human Services*, 39 F. 3d 115, 118-119 (6th Cir. 1994)(Citing *Hardaway v. Secretary of Health and Human Services*, 823 F.2d 922, 927-28 (6th Cir. 1987).  Here, the ALJ reasonably concluded that Dr. Newman's opinion as to Plaintiff's limitations appeared to be overly broad and based on Plaintiff's subjective complaints instead of an objective assessment of functional limitations based on clinical findings and treatment (R.

680).  The ALJ is not bound to accept the opinion of a treating physician if that opinion either lacks sufficient support in terms of medical signs and laboratory findings, or is either internally inconsistent or inconsistent with other credible evidence of record.  20 C.F.R. § 404.1527(c)(2).

Additionally, ALJ Revels was entitled to assess Plaintiff's credibility in regards to his allegations of incapacitating symptoms and limitations, and was not required to include a consideration of those claims, if not credible, in the hypothetical.  In *Jones v. Commissioner of Social Sec*., 336 F.3d 469, 476 (6th Cir. 2003), the Court noted that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.  Here, ALJ Revels found in both her October 2001 and May 2006 decisions that Plaintiff's testimony was not fully credible (R. 316, 680).  ALJ Revels noted the lack of a level of consistent treatment or record of consistent complaints of the pain and functional limitations expressed in Plaintiff's testimony. Further, she indicated in her 2001 decision that Plaintiff indicated a low pain level at all areas of concern, being 4-5 and a 3 on a scale of 1-10.

Accordingly, it is **RECOMMENDED** that ALJ Revels' reasonable weight of the evidence not be disturbed upon judicial review and her finding that Plaintiff was not disabled prior to August 8, 2002, be upheld.

### 2.      Medical Improvement After November 3, 2005

The ALJ found that Plaintiff became disabled in August 2002 when he experienced the onset of a significant cardiac impairment.  ALJ Revels found Plaintiff's disability ceased as of November 2005, however, because his cardiac impairment had improved significantly.  In August 2002, Plaintiff exhibited an ejection fraction of 25 percent; by November 2005 his

25

ejection fraction had improved to 58 percent (R. 477-79, 671-72).  Plaintiff also was no longer

experiencing syncopal or dizzy spells (R. 671-672).

Plaintiff contends the ALJ erred in finding that he experienced medical improvement

such that he was not disabled after November 2005 (Dkt. #40, pp. 13-17).  Plaintiff

acknowledges that he experienced medical improvement in that his ejection fraction improved.

Plaintiff argues, however, that this improvement was not related to his ability to work (*id.*).

Defendant contends that it was reasonable for the ALJ to conclude that a significant increase in

Plaintiff's ejection fraction and cessation of his syncopal and dizzy spells represented a medical

improvement related to Plaintiff's ability to work (Dkt. #49, p. 13).

In order to find that a disability is ended, a specific regulatory analysis must be applied

by the Commissioner, under 20 C.F.R. § 404.1594:

> We must determine if there has been any medical improvement in your
> impairment(s) and, if so, whether this medical improvement is related to your ability
> to work. . . . If medical improvement related to your ability to work has not occurred
> and no exception applies, your benefits will continue. Even where medical
> improvement related to your ability to work has occurred . . . , we must also show
> that you are currently able to engage in substantial gainful activity before we can find
> that you are no longer disabled.

The regulations require that there be actual evidence of improvement in functional

capacity before there can be a determination that the disability is ended. 20 C.F.R. § 404.1594

(b)(4)(i).  Here, however, the ALJ simply concludes that ". . . claimant no longer has a less than

sedentary residual functional capacity brought on by the severity of his cardiomyopathy" without

supportive reasoning (R. 315).  While the standard that the ALJ's decision in disability cases

must be based on consideration of all relevant evidence and the reasons for the ALJ's

conclusions must be stated in a manner sufficient for review does not require a written

evaluation of every piece of testimony and evidence submitted, nevertheless, "to ensure meaningful appellate review at least a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which evidence is presented to counter the agency's position." *Burnett v. Bowen*, 830 F.2d 731, 734-36 (7th Cir. 1987). *See also Falcon v. Heckler*, 732 F.2d 872, 829-30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work).

Plaintiff argues that continued neurologic deficits and significantly decreased range of motion of the cervical and lumbar spine, and the left upper and lower extremity, are apparent in a December 23, 2002, exam by agency consultant Dr. Shelby-Lane (R. 559-563). And that on February 14, 2003, the state non-examining reviewer reports that Plaintiff's physical RFC has declined to less-than-sedentary (R. 565-571) (down from its previous assessment of a limited range of "medium" on January 5, 2000, R. 148-155). In addition, there is the determination by Dr. Newman on September 28, 2004, that recent cervical MRI testing confirms structural findings which, for the first time, make Plaintiff a surgical candidate, where, in 1998, he had not been (R. 192, 635). By early 2005, Plaintiff is also being treated for a new impairment, depression (R. 653, 667).

Defendant counters that while Dr. Shelby-Lane described Plaintiff as exhibiting restricted ranges of motion in his spine and left shoulder, she also reported normal sensation, motor function, gait, stance and grip strength (R. 559-563). In August 2004, Plaintiff also exhibited full ranges of motion throughout the spine, straight leg raising was negative, and sensation and reflexes were normal (R. 631-634). Defendant therefore concludes that it was reasonable for the ALJ to find that as of November 2005 Plaintiff was capable of performing a similar level of

27

activity as he had been prior to the onset of cardiac difficulties.  Yet, the ALJ fails to explain in her decision why she favors the medical evidence argued by Defendant over that offered by Plaintiff as it relates to medical improvement and the ability to work.  More importantly, she does not connect her conclusion of medical improvement in a satisfactory manner with a discussion of the evidence in the record as a whole.

This Court should not guess about missing evidence nor assume the role of fact-finder which Congress placed at the administrative level.  Based on this record, there is not substantial evidence to uphold the findings of the Commissioner on the issue of medical improvement as it relates to the ability to work.  Without such a finding being sustained, there is not substantial evidence to uphold the ultimate finding that the Plaintiff is not disabled after November 2005.

*Faucher v. Sec'y of HHS*, 17 F.3d 171, 176 (6th Cir.1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir.1985).  On the present record it cannot be said that "proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  Accordingly, the matter should be remanded to complete the record to determine whether Plaintiff's medical improvement is related to his ability to work.

## III.   RECOMMENDATION

Accordingly, for the above stated reasons **IT IS RECOMMENDED** that Defendant's motion

be **DENIED** and Plaintiff's motion be **GRANTED IN PART** and this case remanded for further proceedings consistent with this Report and Recommendation.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                    s/Steven D. Pepe

Dated: March 5, 2009                   STEVEN D. PEPE
Ann Arbor, Michigan             UNITED STATES MAGISTRATE JUDGE

Certificate of Service

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 6, 2009.


s/Jermaine Creary

Deputy Clerk